IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TYSHON M. HARMON,<br><br>    Plaintiff,<br><br>  v.<br><br>RICHARD MACK, et al.,<br><br>    Defendants. | No. C 10-4053 LHK (PR)<br><br>ORDER GRANTING<br>DEFENDANTS' MOTION FOR<br>SUMMARY JUDGMENT<br><br><br><br>(Docket Nos. 54 & 87) |

Plaintiff, a state prisoner proceeding *pro se*, filed a civil rights complaint pursuant to 42 U.S.C. § 1983 alleging that various Salinas Valley State Prison ("SVSP") medical personnel violated his constitutional rights. Specifically, Plaintiff alleges that Defendants Dr. Richard Mack, Dr. Donald Pompan, Dr. Sam Pajong, and Nurse C. Sevier were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment.[1] Defendants have moved for summary judgment. (Docket no. 54.) Plaintiff filed his opposition. Defendants filed their reply. Having carefully considered the papers submitted, the Court hereby GRANTS Defendants' motion for summary judgment for the reasons set out below.

///

---

[1] Defendants Kachare, Remington, Bowman, Rodriguez, and Moses were dismissed without prejudice from this action for Plaintiff's failure to provide the Court with location information such that the Marshal could effect service upon them. (*See* Docket No. 79.)

Order Granting Defendants' Motion for Summary Judgment
G:\PRO-SE\SJ.LHK\CR.10\Harmon053_grant-msj.hhl.wpd

# BACKGROUND[2]

On May 10, 2008, Plaintiff filed a health care services request form stating that he had a history of knee problems and that he had recently "tweaked" his knee. (Compl. at 3, Ex. 1.) Plaintiff complained that when he walks it feels "as though bone is rubbing gainst bone" and that there was now swelling. (*Id.*) Plaintiff stated that his pain level was an "8" on a level of "1-10." (*Id.*)

A nurse assessed Plaintiff on May 13, 2009, and ordered 200 mg tablets of ibuprofen (Motrin) four times daily, as needed, for seven days. She also encouraged Plaintiff to apply heat to the knee. (Mot. Summ. J. ("Mot.") at 2, Ex. A at 2-3.) The same day, Plaintiff was seen by Defendant Dr. Richard Mack who ordered an ex-ray of Plaintiff's hurt knee and increased the Motrin prescription to 400 mg three times daily for 60 days. (Compl. at 3; Mot., Ex. A at 4.) The x-ray revealed that there was a "small area of focal sclerosis in the shaft of the distal femur with reasonably well defined margins" which the reviewing radiologist did not believe was "of any significance," and that the "tibial apopysis is separated from the parent bone." (*Id.*, Ex. 4 at 2.) The radiologist noted no soft tissue swelling or other pathology. (*Id.*)

On May 18, 2008, Plaintiff filed another health care services request form seeking follow- up treatment and claiming that the pain medication was insufficient because he was taking three times the dosage "just for some small relief." (*Id.*, Ex. 3.) Plaintiff admits in his deposition that he was still making the 10-minute walk to and from the dining hall unassisted twice a day around this time. (Pl.'s Depo., 26:16-23; 25:15-16.)[3] Plaintiff made no attempts to ameliorate his knee pain with heat, ice or a knee wrap. (*Id.*, 28:16-23.)

On June 1, 2008, Plaintiff filed a "Reasonable Modification or Accomodation Request" form stating that he had yet to receive a follow-up appointment. (*Id.*, Ex. 4 at 1.) Plaintiff requested: (1) a lower tier/lower bunk chrono so that he could avoid aggravating his knee by

---

[2] The following facts are undisputed unless otherwise indicated.

[3] Plaintiff's deposition transcript is attached as Exhibit 1 to the Declaration by Defendants' counsel, M. Grigg. (Docket No. 54-2.)

climbing up stairs or a bunk; (2) a knee brace; and (3) a higher dosage of Mortrin. (*Id.*) The request was partially granted on June 13, 2008, and a follow-up appointment was scheduled with Dr. Mack. (*Id.*, Ex. 4 at 3.)

When Plaintiff saw Dr. Mack on June 16, 2008, he complained of his ongoing knee pain. (Compl. Attach. at 1.) Dr. Mack increased the Motrin dosage to 600 mg three times daily for 45 days, and cautioned Plaintiff against overmedicating. (*Id.*, Ex. 5.) Dr. Mack also ordered a lower bunk for Plaintiff and a follow-up in 30 days. (*Id.*, Ex. 6.) The same day, Dr. Mack filed a request to the orthopedic clinic, indicating that Plaintiff was complaining of knee problems. (*Id.*, Ex. 9.)

Plaintiff saw Dr. Mack again on July 25, 2008, for an asthma-related chronic care appointment. (Pl.'s Depo., 37:19-38:2; Compl., Ex. 7.) Plaintiff again complained of ongoing knee pain and stiffness, and indicated that the Motrin was not working. (Compl. Attach. at 1.) However, Plaintiff admits in his deposition that the pain had improved from an "8" to a "6." (Pl.'s Depo., 38:17-25.) Dr. Mack ordered a knee brace, a lower tier placement, continuation of the lower bunk assignment, and an MRI of Plaintiff's right knee. (*Id.*) According to Plaintff, Dr. Mack refused to prescribe other pain medication. (Compl. Attach. at 1.)

On July 27, 2008, Plaintiff submitted a request for more Motrin because he had lost his medicine bag. (Mot., Ex. A at 14.) When called to the nurse line two days later for a refill, Plaintiff refused to go for reasons he cannot recall. (Pl.'s Depo., 42:9-10.) He did not submit a medical request slip seeking more pain medication until November 2008. (Mot. at 3.)

The MRI was completed on August 6, 2008. (Mot. at 4.) The report dated August 13, 2008, revealed the following: (1) a completely torn anterior cruciate ligament ("ACL"); (2) an "incomplete fracture through the medial proximal tibial metaphysis"; (3) "bone contusions within the medial demoral condyle"; and (4) "no definite evidence of meniscal tears." (Compl., Ex. 12 at 3-4.) On August 20, 2008, Dr. Mack received and reviewed the report, and confirmed that Plaintiff was scheduled for a follow-up. (Mot., Ex. A. at 17.)

///

///

On September 10, 2008, Plaintiff was seen by Dr. Robert Bowman[4] at the orthopedic clinic. (Compl. Attach. at 1, Exs. 9 & 10.) Dr. Bowman noted that Plaintiff's knee was painful and unstable, and that he had a torn ACL. (*Id.*, Ex. 10.) He also noted that Plaintiff's knee appeared normal and had no swelling or joint effusion. (Mack Decl., Ex. A at 18.) Dr. Bowman recommended that Plaintiff be referred to Dr. Pompan for possible surgery. (*Id.,* Ex. 9.) During his deposition, Plaintiff states that his pain level was a "6" at this time despite having no Motrin since the loss of his medicine bag on July 27, 2008. (Pl.'s Depo., 45:16-18.)

On October 30, 2008, Plaintiff was seen by Nurse Practitioner R. Rodriguez[5], for a chronic care appointment relating to his asthma. (*Id.*, 47:13-16.) Nurse Rodriguez noted that Plaintiff had right knee pain and was awaiting an appointment with Dr. Pompan. (Mack Decl., Ex. A at 21-22.) She ordered a follow-up in 30 days to ensure the appointment occurred. (*Id.*)

On November 4, 2008, Plaintiff was seen by Defendant Dr. Donald Pompan, an orthopedic surgeon, for an initial consultation. (Mot. at 4, Mack Decl., Ex. A at 23.) Plaintiff complained of right knee instability, pain and occasional swelling. (*Id.*) Dr. Pompan recommended ACL reconstruction, described the proposed procedure, and suggested some strengthening exercises that Plaintiff could do for a better post-op outcome. (*Id.*) According to Plaintiff, Dr. Pompan refused to prescribe pain medication. (Compl. Attach. at 2.)

On November 8, 2008, Plaintiff submitted a medical request slip, his first since July 2008, claiming that he had been having constant knee pain for a few months and that it was "unbearable." (Mack Decl., Ex. A at 24.) The next day on November 9, 2008, Plaintiff filed an inmate health care appeal, claiming that medical staff was denying him pain medication for his knee problems and demanding "pain medication suitable for [his] condition." (Compl., Ex. 12.) On November 12, 2008, a nurse assessed Plaintiff in response to his medical request slip, and Plaintiff complained to her of experiencing a pain below his knee cap for a few months. (Mack

---

[4] *See supra* at 1, n. 1.

[5] *See supra* at 1, n. 1.

1  Decl., Ex. A at 25.)  The nurse ordered naproxen sodium every 8-12 hours as needed and
2  recommended heat.  (*Id.*)  Plaintiff was stable and walked back to his cell.  (*Id.*)

3        On December 8, 2008, Plaintiff submitted another grievance about his knee.  (Compl.,
4  Ex. 33.)  Plaintiff admits in deposition that his knee pain remained moderate around that time.
5  (Pl.'s Depo., 60:11-14.)  On December 24, 2008, a nurse practitioner evaluted Plaintiff and
6  submitted a referral requesting a scheduling of the ACL reconstruction and pre-operative
7  consultation.  (Mack Decl., Ex. A at 26-28.)  Two day later on December 26, 2008, Dr. Daodu
8  prescribed 600 mg of Motrion for 60 days to be taken three times daily and methocarbamol (a
9  muscle relaxant that blocks pain sensation) to take twice daily, as needed.  (*Id.*, at 29-30.)
10  Plaintiff kept both medications on his person.  (*Id.*)

11        Plaintiff met with Dr. Pompan on January 13, 2009, for a pre-operative evaluation.  (*Id.*,
12  at 31.)  Dr. Pompon made the following notes in his report: "[Plaintiff] is a 33-year-old male
13  who injured his right knee playing baseball six months ago.  He has chronic pain and is
14  debilitated.  His knee goes out on him.  He has done exercises and strengthening.  He apparently
15  has failed conservative management."  (Compl., Ex. 14.)  After discussing the risks associated
16  with ACL resconstructive surgery, Plaintiff agreed to the procedure.  (D. Pompan Decl., ¶ 8.)

17        Dr. Pompan performed ACL reconstruction surgery on Plaintiff on February 4, 2009, at
18  the Las Ventanas Surgery Center.  (Compl. Attach. at 3.)  The procedure was successful and
19  involved no complications.  (D. Pompan Decl., ¶ 10; Mack Decl., Ex. A at 34-39.)  Dr. Pompan
20  injected morphine and marcaine (a local anesthetic) to Plaintiff's knee joint to alleviate post-
21  operative pain, which generally would continue to provide relief for up to 24 hours.  (*Id.*)  Dr.
22  Pompan recommended post-operative pain medication, crutches, no weight-bearing knee
23  elevation, and a follow-up.  (*Id.*, at 40.)

24        Plaintiff was transported back to SVSP on the same day.  (Compl. Attach. at 3.)  He was
25  taken to the prison hospital where a nurse assessed him and found no swelling or redness.  She
26  also read Dr. Pompan's discharge recommendations.  (*Id.*, at 41.)  The nurse then called Dr.
27  Pajong, the doctor assigned to the Treatment and Triage Area that day.  (Pajong Decl., ¶ 6.)  Dr.
28  Pajong ordered the following: (a) a morphine sulfate to be taken twice daily for 14 days, (b)

1  colace (stool softener), (c) crutches for 4 weeks, (d) a lower level cell with a lower bunk for 4
2  weeks, (e) no weight bearing for 4 weeks, (f) knee elevation, (g) a follow-up with Plaintiff's
3  primary care provider, (h) a follow-up with Dr. Pompan, and (i) that Plaintiff contact medical
4  staff if signs or stymptons of infection arise. (*Id.*, ¶ 8; Compl., Exs. 21 & 22.) According to
5  Plaintiff, Dr. Pajong informed him that instead of Vicodin, which had been recommended by Dr.
6  Pompan, he was prescribing Morphine and a stool softener to help with the side effects of the
7  morphine. (Comp. Attach. at 3.) Plaintiff received the crutches, a lower bunk and lower tier
8  placement as ordered, but not the medication on the night of February 4, 2009. (*Id.*) Plaintiff
9  admits in his deposition that although his knee pain flared when his knee was jarred, it did not
10 bother him if he did not move it. (Pl.'s Depo., 68:13-17.) That night, Plaintiff got out of bed and
11 stopped Defendant Nurse C. Sevier while she was distributing medication to all inmates in his
12 building, and asked whether she had any drugs for him. (Compl. Attach. at 3-4.) Nurse Sevier
13 informed Plaintiff that she had no pain medication for him as the pharmacy had given her none,
14 and that she lacked the authority to prescribe medication. (C. Sevier Decl., ¶ 9.) Plaintiff
15 describes Nurse Sevier as "polite," positive and "always had a smile on her face." (Pl.'s Depo.,
16 75:19; 76:6-12.) Plaintiff slept 5 to 6 hours that night. (*Id.*, 79:3-8.)

17        The next morning on February 5, 2009, Plaintiff asked Nurse S. Remington[6] as she was
18 passing his cell if she had any medication for him. (Compl. Attach. at 4.) She replied no. (*Id.*)
19 Plaintiff informed her about his surgery the day before and that he was in extreme pain. (*Id.*)
20 When he asked Nurse Remington if there was anyone she could call concerning his pain
21 medication, she said there was nothing she could do and recommended that Plaintiff fill out a
22 health care services request form explaining his problem. (*Id.*) Plaintiff filed a form that day,
23 stating that he had not yet received any pain medication post-op. (*Id.*, Ex. 23.) Later that day,
24 Nurse Remington brought Plaintiff a carry bag of medication containing the stool softener that
25 was ordered by Dr. Pajong but no morphine. (Compl. Attach. at 4.) In the evening, Plaintiff

---

[6] *See supra* at 1, n. 1.

1 asked Nurse Sevier if she had any medication for him, and her response was the same as the
2 night before. (*Id.*)

3 On February 6, 2009, Plaintiff again informed Nurse Remington in the morning that he
4 still had no pain mediciation. She responded that she did not have any medication for him and
5 that there was nothing she could do. (*Id.*)

6 On February 7, 2009, Plaintiff told Nurse Moses[7], the morning nurse, of his surgery and
7 need for pain medication. Nurse Moses informed Plaintiff that Nurse Moses had no pain
8 medication for Plaintiff, but that Nurse Moses would check the computer. (*Id.*) Nurse Moses
9 later informed Plaintiff that the computer indicated that Plaintiff was only prescribed stool
10 softener and nothing else, and that there was nothing he could do. (*Id.*)

11 Plaintiff claims that on February 8, 2009, he again spoke with Nurse Sevier about his
12 pain medication, and was again informed that she had nothing for him. (*Id.*) Plaintiff described
13 his expression as "blank" during this brief interaction. (Pl's Depo., 94:13-15.) However,
14 Defendants point out that February 8 was a Sunday, and Nurse Sevier only worked Mondays
15 through Fridays. (Mot. at 7, n. 3; Sevier Decl., ¶ 4.)

16 On February 9, 2009, Plaintiff informed Nurse Remington again about his situation, and
17 she informed him that until he was seen by the doctor, there was nothing she could do. (Compl.
18 Attach. at 5-6.) Plaintiff filled out another health care services request form at her suggestion on
19 February 10, 2009. (*Id.*, Ex. 25.)

20 On February 13, 2009, Plaintiff received pain medication after the nurse who received his
21 medical request filed on February 10, 2009, checked his chart for a morphine sulfate order. (*Id.*,
22 Ex. 26). The order was found and faxed to the pharmacy, and Plaintiff received his medication
23 that night. (*Id.*) With the morphine, Plaintiff's level of pain decreased from 7-8 to 4-5. (Pl.'s
24 Depo., 100:17-101:2, 103:22-25; 104:6-7.)

25 On February 19, 2009, Plaintiff went back to the hospital for a post-surgical evaluation.
26 (Pompan Decl., ¶ 14; Mack Decl., Ex. A at 48.) Dr. Pompan removed the bandage and staples

27
28
---
[7] *See supra* at 1, n. 1.

and provided a knee brace. (*Id.*; Compl. Attach. at 6.) On the same day, Plaintiff filled out a health care services request form seeking a "lay-in"[8] and an appointment with a doctor to renew his prescription before it expired. (*Id.*, Ex. 29.)

On February 24, 2009, Plaintiff was seen by Dr. K. Kachare.[9] (Compl. Attach. at 6, Ex. 31; Mack Decl., Ex. A at 51-52.) The notes from Dr. Kachare's examination indicate that Plaintiff admitted to having "not much pain [in right knee] in brace" but still wanting to continue his morphine prescription. Dr. Kachare noted that Plaintiff had been given morphine on February 4, 2009, which was extended for 14 days on February 13, 2009, by Dr. Pajong. (*Id.*) She noted that there was "no medical necessity for continuation of Morphine... 14 days post-op." (*Id.*)  She instead prescribed Motrin and Tylenol for 60 days to "avoid opioid dependence/addiction and avoid overdose." (*Id.*)  When Petitioner threatened to submit a grievance if she did not renew his morphine, Dr. Kachare had Plaintiff escorted out. (*Id.*) Plaintiff admits in his deposition that the day before his visit with Dr. Kachare, Plaintiff's pain was "fine" or "about a 4 or 5." (Pl's Depo., 112:22-25; 113:1-3.)

On February 25, 2009, Plaintiff received two medicine bags - one full of Tylenol and the other full of Motrin - with instructions to take one of the medications four times a day and the other three times a day, as prescribed by Dr. Kachare. (Compl. Attach. at 7.)

On February 26, 2009, Plaintiff filed an emergency health care appeal form explaining his surgery, the inadequate pain medication, and expressing dissatisfaction with his treatment. (*Id.*, Ex. 13. at 1-2.) Plaintiff requested "suitable pain medication" because Motrin and Tylenol were "not good enough." (*Id.*) Plaintiff's appeal was ultimately denied at the Director's Level, which found that the care Plaintiff received was "adequate" and that he had received "medical treatment and pain medication to address [his] concerns." (*Id.* at 7.)

On March 10, 2009, Plaintiff saw Dr. Pompan whom Plaintiff informed of Plaintiff's inability to obtain sufficient pain medication. (Compl. Attach. at 10.) According to Plaintiff, Dr.

---

[8] A "lay-in" appears to be the equivalent of a doctor's note, excusing Plaintiff from work duties and allowing for meals to be delivered to his cell.

[9] *See supra* at 1, n. 1.

1 Pompan expressed concern that Plaintiff did not receive pain medication for 9 days following the
2 surgery. (*Id.*) Dr. Pompan informed him that he could not make prison doctors give Plaintiff
3 any specific medication and that all he could do was make recommendations. (*Id.*) Plaintiff was
4 again seen by Dr. Pompan on April 14, 2009, at which time Plaintiff's knee was stable and pain-
5 free with full range of motion. (Mack Decl., Ex. A at 54.)

6 Plaintiff claims that all the Defendants acted with deliberate indifference to serious
7 medical needs when they denied him adequate pain medication, in violation of his Eighth
8 Amendment right against cruel and unusual punishment.

## MOTION FOR SUMMARY JUDGMENT

I. <u>Legal Standard</u>

Summary judgment is proper where the pleadings, discovery and affidavits demonstrate that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.*

The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery and affidavits which demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Cattrett*, 477 U.S. 317, 323 (1986). Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. But on an issue for which the opposing party will have the burden of proof at trial, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The Court is only concerned with disputes over material facts and "factual disputes that are irrelevant or unnecessary will not be counted."

*Liberty Lobby*, 477 U.S. at 248. It is not the task of the Court to scour the record in search of a genuine issue of triable fact. *Keenan v. Allen*, 91 F.3d 1275, 1279 (9th Cir. 1996). The nonmoving party has the burden of identifying, with reasonable particularity, the evidence that precludes summary judgment. *Id.* If the nonmoving party fails to make this showing, "the moving party is entitled to judgment as a matter of law." *Celotex Corp.*, 477 U.S. at 323.

The Court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact. *See T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The evidence must be viewed in the light most favorable to the nonmoving party, and the inferences to be drawn from the facts must be viewed in a light most favorable to the nonmoving party. *See id.* at 631.

II. <u>Evidence Considered</u>

A district court may only consider admissible evidence in ruling on a motion for summary judgment. *See* Fed. R. Civ. P. 56(e); *Orr v. Bank of America*, 285 F.3d 764, 773 (9th Cir. 2002). In support of Defendants' motions for summary judgment, declarations have been filed by Defendants Dr. R. Mack, Dr. S. Pajong, and Nurse C. Sevier, and by Matthew M. Grigg, Defendants' counsel, with supporting exhibits, as well as a transcript of Plaintiff's deposition taken on June 2, 2011. *See* Fed. R. Civ. P. 56(c), (e).

Plaintiff has verified his complaint and opposition by signing them under "penalty of perjury."

III. <u>Analysis</u>

Deliberate indifference to a prisoner's serious medical needs violates the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). A prison official violates the Eighth Amendment only when two requirements are met: (1) the deprivation alleged is, objectively, sufficiently serious, and (2) the official is, subjectively, deliberately indifferent to the inmate's health or safety. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

A "serious" medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the "unnecessary and wanton infliction of pain." *Id.* The following

are examples of indications that a prisoner has a "serious" need for medical treatment: the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain. *McGuckin v. Smith*, 974 F.2d 1050, 1059-60 (9th Cir. 1992), *overruled on other grounds*, *WMX Technologies, Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc).

A prison official exhibits deliberate indifference when he knows of and disregards a substantial risk of serious harm to inmate health. *See Farmer*, 511 U.S. at 837. The official must both know of "facts from which the inference could be drawn" that an excessive risk of harm exists, and he must actually draw that inference. *Id.* "A difference of opinion between a prisoner-patient and prison medical authorities regarding treatment does not give rise to a § 1983 claim." *Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th Cir. 1981). Where doctors have chosen one course of action and a prisoner-plaintiff contends that they should have chosen another course of action, the plaintiff "must show that the course of treatment the doctors chose was medically unacceptable under the circumstances, . . . and the plaintiff must show that they chose this course in conscious disregard of an excessive risk to plaintiff's health." *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996) (internal citations omitted).

   A. <u>Claims Against Defendant Dr. Mack</u>

Even assuming that Plaintiff had a serious medical condition, there is an absence of evidence that Defendant Dr. Mack knew that Plaintiff faced a substantial risk of harm, and consciously disregarded it by failing to take reasonable steps to abate it. *See Farmer*, 511 U.S. 825, 837 (1994).

Plaintiff saw Dr. Mack for the first time on May 13, 2009, after he first complained of knee pain and swelling. *See supra* at 2. Although a nurse had already prescribed 200 mg of Motrin, Dr. Mack increased the prescription to 400 mg to be taken three times daily for 60 days. *Id.* Plaintiff does not allege that Dr. Mack acted with deliberate indifference on this occasion.

Plaintiff next saw Dr. Mack on June 16, 2008, when he complained of ongoing knee pain. *Id.* at 3. Dr. Mack responded to Plaintiff's request for more medication by increasing the dosage

to 600 mg three times daily for 45 days, and also cautioned Plaintiff against overmedicating. *Id.* Dr. Mack states in his declaration in support of Defendants' motion for summary judgment that he cautioned Plaintiff against taking more than the prescribed dosage "because I did not want him to experience gastrointestinal damage." (Mack Decl., ¶ 10.) Dr. Mack also ordered a lower bunk for Plaintiff, filed a request for Plaintiff to the orthopedic clinic, and ordered a follow-up in 30 days. *Id.* Here, Dr. Mack's response to Plaintiff's medical needs does not indicate deliberate indifference because the undisputed evidence shows that he took reasonable steps to address them.

Plaintiff last saw Dr. Mack on July 25, 2008, for an asthma-related chronic care appointment. *Id.* In his complaint, Plaintiff asserts that he complained to Dr. Mack of ongoing knee pain and stiffness, but that Dr. Mack refused to prescribe more pain medication. (Compl. Attach. at 1.) However, Plaintiff's own admissions indicate that there was no reason for Dr. Mack to believe that Plaintiff was in acute distress. According to Plaintiff's deposition, he merely stated to Dr. Mack, "I need some pain medications" without further discussion about the duration, location or severity of his knee pain. (Pl's Depo., 34:15-20.) Dr. Mack states in his declaration that Plaintiff did not exhibit any objective indicia of pain: "he did not appear to be in excessive discomfort, he was not grimacing in pain, he did not have an elevated pulse and he did not appear to be in any acute distress." (Mack Decl., ¶ 12.) Plaintiff also admits in his deposition that the pain had improved from an "8" to a "6." (Pl.'s Depo., 38:17-25.) Furthermore, Dr. Mack states that to his knowledge, Plaintiff was still taking 600 mg Motrin three times daily. (Mack Decl., ¶ 11.) The undisputed evidence shows that on July 27, 2008, Plaintiff submitted a request for more Motrin because he had lost his medicine bag. (Mot., Ex. A at 14.) Clearly, Plaintiff still had an ongoing prescription for pain medication at this time. In addition, Dr. Mack asserts that he did not change the prescription because he "knew that it would not address the underlying cause and thought some non-medicinal treatments would significantly alleviate his discomfort." (Mack Decl., ¶ 11.) In accordance with this medical opinion, Dr. Mack ordered a knee brace, a lower tier placement, continuation of the lower bunk assignment, and an MRI of Plaintiff's right knee. *See supra* at 3. Plaintiff fails to show that Dr. Mack's

chosen course of treatment at this point was "medically unacceptable under the circumstances" and that he chose this course "in conscious disregard of an excessive risk to plaintiff's health." *Jackson*, 90 F.3d at 332. A mere difference of opinion between Plaintiff and Dr. Mack with respect to the course of treatment does not give rise to a § 1983 claim. *Franklin*, 662 F.2d at 1344.

In his complaint, Plaintiff asserts that from August 13, 2008, the date when the MRI results were made known, until December 26, 2008, he received no pain medication, for a total of 136 days. (Compl. Attach. at 2.) Plaintiff claims that Dr. Mack should have ordered more medication after the August 13, 2008 MRI report indicated an ACL tear. Defendants assert that there was nothing in the MRI report to alert Dr. Mack of the need to reassess Plaintiff's pain medication. (Mack Decl., ¶ 15.) Dr. Mack declares that a torn ACL does not automatically indicate a need for a change in pain medication. (*Id.*) Furthermore, there is no evidence to indicate that Dr. Mack was aware that Plaintiff was in need of more pain medication after his last examination. As discussed above, Dr. Mack last examined Plaintiff on July 25, 2008, when he still had a prescription for Motrin. *See supra* at 12. Dr. Mack states that he was not aware that the prescription was set to expire on July 31, 2008, and that even if he had been aware, "the standard of care did not require preemptively reordering more ibuprofin in such circumstances, especially in the absence of a request for more." (Mack Decl., ¶ 13.) Later, Plaintiff did not seek to replace the medicine which he claims he lost on July 27, 2008, without explanation. *See supra* at 3. In opposition, Plaintiff asserts that Defendants have failed to offer proof that he signed a form refusing treatment in accordance with prison policy. (Oppo. at 16.) However Plaintiff himself does not deny that he lost his bag on July 27, 2008, and admits in deposition that the loss was probably why he was summoned to the nurse line. (Pl.'s Depo., 42:9-10.) Furthermore, the record shows that he did not submit another request for pain medication until November 2008. *See supra* at 4. Plaintiff fails to show that from August 13, 2008 until December 26, 2008, Dr. Mack acted with deliberate indifference with respect Plaintiff's medical needs because there is no evidence indicating that Dr. Mack knew of and yet disregarded a

substantial risk of serious harm to Plaintiff. *See Farmer*, 511 U.S. at 837. Dr. Mack is entitled to summary judgment as a matter of law.[10] *See Celotex Corp.*, 477 U.S. at 323.

### B.  Claims Against Defendant Dr. Pompan

In his complaint, Plaintiff claims that Defendant Dr. Pompan was deliberately indifferent during consultations on November 4, 2008, and January 13, 2009. Defendants point out that in his deposition, Plaintiff admits that Dr. Pompan did nothing wrong on January 13, 2009. (Mot. at 13, citing to Pl's Depo., ¶ 62:4-6.) Accordingly, the Court will only address Plaintiff's claims against Dr. Pompan based on his November 4, 2008 examination.

On November 4, 2008, Plaintiff was seen by Dr. Pompan for an initial consultation. *See supra* at 4. Plaintiff complained of right knee instability, pain and occasional swelling. *Id.* Dr. Pompan recommended ACL reconstruction, described the proposed procedure, and suggested some strengthening exercises Plaintiff could do for a better post-op outcome. *Id.* According to Plaintiff, Dr. Pompan refused to prescribe pain medication. (Compl. Attach. at 2.) Dr. Pompan states in his declaration that he is an independent contractor and as such is not allowed to prescribe medication; he can only make recommendations. (Pompan Decl., ¶ 4.) Dr. Pompan declares: "Had [Plaintiff] made clear to me that he was not receiving medication, my custom and practice dictates that I would write that down and I would have made a recommendation for pain medication. That I did not do so means I was unaware of any need for pain medication such that a recommendation would have been indicated." (*Id.*) In his opposition, Plaintiff asserts that Dr. Pompan should have at least filed a recommendation that Plaintiff be prescribed pain medication, which "would [have] been an enormous endorsement to which[]ever doctor the Plaintiff was next examined by." (Oppo. at 17.)

Assuming as true that Plaintiff requested pain medication but Dr. Pompan refused to prescribe it, there is nothing in the evidence to indicate that Dr. Pompan knew of and yet disregarded a substantial risk of serious harm to Plaintiff's health. *See Farmer*, 511 U.S. at 837.

---

[10] Accordingly, the Court need not address Defendants' motion to dismiss on the grounds that Plaintiff failed to exhaust his adminstrative remedies with respect to his claims against Dr. Mack. (Mot. at 14-15.)

The official must both know of "facts from which the inference could be drawn" that an excessive risk of harm exists, and he must actually draw that inference. *Id.* Other than Plaintiff's conclusory statements that Dr. Pompan acted with deliberate indifference, there is no evidence in the record to indicate that Dr. Pompan actually concluded during his examination that Plaintiff was not receiving pain medication and that his failure to recommend it would result in exposing Plaintiff to further harm. Rather, Dr. Pompan's declaration indicates that had he actually known Plaintiff was not receiving medication for his knee pain, he would have made the recommendation in accordance with custom and practice. (Pompan Decl., ¶ 4.) Plaintiff fails to show otherwise. Accordingly, Dr. Pompan is entitled to summary judgment on this claim. *See Celotex Corp.*, 477 U.S. at 323.

   C. <u>Claims against Defendant Dr. Pajong</u>

Plaintiff claims that Dr. Pajong acted with deliberate indifference by his failure to ensure that Plaintiff received the morphine sulfate as ordered. (Pl.'s Depo., 65:15-20.)

It is undisputed that that upon Plaitniff's admission into the prison hospital on February 4, 2009, Dr. Pajong ordered the following: (a) a morphine sulfate to be take twice daily for 14 days, (b) colace, (c) crutches for 4 weeks, (d) a lower level cell with a lower bunk for 4 weeks, (e) no weight bearing for 4 weeks, (f) knee elevation, (g) a follow-up with Plaintiff's primary care provided, (h) a follow-up with Dr. Pompan, and (i) that Plaintiff contact medical staff if signs or stymptons of infection arise. *See supra* at 5-6. It is undisputed that Plaintiff did not actually receive morphine as prescribed until February 13, 2009. *Id.* at 6. However, there is nothing in the record to indicate that Dr. Pajong was responsible for Plaintiff not receiving the medication as prescribed. Dr. Pajong never personally saw Plaintiff again nor was he aware that Plaintiff was not receiving his medication as prescribed until February 13, 2009. (Pajong Decl., ¶ 9.) It is undisputed that Plaintiff at least received the stool softener as prescribed. *See supra* at 6. However, Plaintiff cannot attribute the lack of morphine sulfate from February 4 until February 13, 2009, to Dr. Pajong. Nowhere in his complaint does he allege that Dr. Pajong knew or had reason to know. In fact, Dr. Pajong did not become aware of this fact until February 13, 2009, when a nurse called and informed Dr. Pajong that Plaintiff had not been receiving his morphine.

(Pajong Decl., ¶ 11.)  Dr. Pajong immediately gave another order for 2 weeks of morphine sulfate, which Plaintiff received.  (*Id.*)

As discussed above, a prison official exhibits deliberate indifference when he knows of and disregards a substantial risk of serious harm to inmate health.  *See Farmer*, 511 U.S. at 837.  The official must both know of "facts from which the inference could be drawn" that an excessive risk of harm exists, and he must actually draw that inference.  *Id.*  Here, the evidence fails to show that Dr. Pajong was in fact aware that Plaintiff was not receiving his prescribed pain medication such that he had a duty to act because he knew Plaintiff would face a substantial risk of serious harm otherwise.  Plaintiff's argument in opposition that Dr. Pajong failed to follow prison medication managment procedures is irrelevent.  (Oppo. at 18-19.)  The issue is whether Dr. Pajong actually knew, not whether he should have known, and whether he in fact drew the inference that Plaintiff faced a substantial risk of serious harm to his health.  *See Farmer*, 511 U.S. at 837.  The undisputed evidence shows that he did not.  Accordingly, Dr. Pajong is entitled to summary judgment on this claim.  *See Celotex Corp.*, 477 U.S. at 323.

### D. Claims against Defendant Nurse Sevier

Plaintiff claims that Defendant Nurse Sevier failed to adequately respond to his requests for pain medication between February 4, 2009, and February 9, 2009, and thereby acted with deliberate indifference.  *See supra* at 7.

According to the record, Plaintiff first asked Nurse Sevier on the night of February 4, 2009, whether she had any medication for him.  *See supra* at 6.  Nurse Sevier informed Plaintiff that she had no pain medication for him as the pharmacy had given her none, and that she lacked the authority to prescribe medication.  (C. Sevier Decl., ¶ 9.)  He asked her again the following evening, and her response was the same as the night before.  *See supra* at 7.  Plaintiff claims that he next spoke to Nurse Sevier on February 8, 2009, but Defendants point out that February 8 was a Sunday, and Nurse Sevier only worked Mondays through Fridays.  (Mot. at 7, n. 3; Sevier Decl., ¶ 4.)

Even assuming that Plaintiff's allegations against Defendant Nurse Sevier are true, his claim against her does not amount to an Eighth Amendment violation.  At most, her actions may

constitute medical malpractice or negligence, which are insufficient to make out a violation of the Eighth Amendment. *See Toguchi v. Chung*, 391 F.3d 1051, 1060-61 (9th Cir. 2004); *Hallett v. Morgan*, 296 F.3d 732, 744 (9th Cir. 2002); *Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th Cir. 1981); *see, e.g.*, *Frost v. Agnos*, 152 F.3d 1124, 1130 (9th Cir. 1998) (finding no merit in claims stemming from alleged delays in administering pain medication, treating broken nose and providing replacement crutch, because claims did not amount to more than negligence); *O'Loughlin v. Doe*, 920 F.2d 614, 617 (9th Cir. 1990) (repeatedly failing to satisfy requests for aspirins and antacids to alleviate headaches, nausea and pains is not constitutional violation; isolated occurrences of neglect may constitute grounds for medical malpractice but do not rise to level of unnecessary and wanton infliction of pain). Accordingly, Nurse Sevier is entitled to summary judgment.[11] *See Celotex Corp.*, 477 U.S. at 323.

## CONCLUSION

Accordingly, Defendants Dr. Richard Mack, Dr. Donald Pompan, Dr. Sam Pajong, and Nurse C. Sevier's motion for summary judgment is GRANTED. (Docket no. 54.) Thus, the Court finds it unnecessary to address Defendants' argument that they are entitled to qualified immunity.

Plaintiff has filed a motion for the Court to order Defendants to use Plaintiff's address of record and to mark all correspondence as "confidential." The motion is GRANTED, and Defendants are directed to act accordingly. (Docket no. 87.)

The Clerk shall terminate all pending motions and close the file.

IT IS SO ORDERED.

DATED: 3/22/12

LUCY H. KOH
United States District Judge

---

[11] Accordingly, the Court need not address Defendants' motion to dismiss on the grounds that Plaintiff failed to exhaust his adminstrative remedies with respect to his claims against Nurse Sevier. (Mot. at 21-22.)